UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                       )      Case No.  10-20733-BKC-AJC

HARBOUR EAST DEVELOPMENT, LTD     )      Chapter 11

                Debtor.         )

**DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING THE SALE OF PENDING SALE CONDOMINIUM UNITS PURSUANT TO 11 U.S.C. § 363 FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES, AND (II) ESTABLISHING PROCEDURES FOR FUTURE SALES OF CONDOMINIUM UNITS**

Harbour East Development, Ltd. (the "Debtor"), debtor and debtor in possession, respectfully requests the entry of an order by this Court (1) authorizing the sale of condominium units pursuant to existing purchase and sale contracts, as modified, pursuant to 11 U.S.C. § 363, free and clear of all liens, claims, and encumbrances, and (2) establishing procedures for future sales of condominium units:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this motion (the "Motion") pursuant to 28 U.S.C. §§157 and 1334.

2.      The subject matter of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1408.

4.      The statutory predicate for the relief sought by the Motion is § 363 of the Bankruptcy Code.

**BACKGROUND**

**A.      General Background**

5.      On April 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.     The Debtor has been operating its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

7.     As of the date hereof, no creditors' committee has been appointed or designated in this case. In addition, no request for the appointment of a trustee or examiner has been made.

8.     The Debtor is a limited partnership organized and existing under the laws of the State of Florida.

9.     The general partner of the Debtor is Harbour Development, LC, a Florida limited liability company.  The manager/member of the general partner is Mario Egozi ("Egozi").

**B.     CIELO on the Bay**

10.     The Debtor is the developer and owner of the luxury residential condominium development known as CIELO on the Bay ("CIELO" or the "Property") located at 7935 East Drive, North Bay Village, Florida. CIELO contains 35 residential condominium units (the "Condominium Units"). Condominium Units range in size from 1,840 square feet to 1,900 square feet and are configured as two-bedroom, three bedroom, and penthouse units.[1] The Condominium Units are either designer ready, unfinished, or developer finished for rental and feature expansive views of the Miami Beach skyline and Biscayne Bay.

11.     CIELO includes a fitness center, a swimming pool, a private residence lounge, and other similar upscale amenities. The building also offers computerized security and safety systems and an indoor parking garage.

**C.     Reasons for Chapter 11 Filing**

12.     The Debtor filed Chapter 11 because of (a) the declining real estate market and the unavailability of financing for unit purchasers, (b) Northern Trust Bank's ("Northern"), the Debtor's original construction lender, unreasonable refusal to consent to the Debtor's reduction of

---

[1] CEILO contains one 4-bedroom unit of 3,704 square feet, which is combination of 2 units.

condominium sale prices in response to changing market conditions and to leasing and rent-to-own programs, and (c) its inability, due to credit market conditions, to renew, repay, or refinance its mortgage debt owed to Northern, which matured in April of 2009. In the past year, potential purchasers of condominiums at CIELO have sought significant purchase price reductions. Because Northern refused to grant the Debtor relief from minimum release price covenants, the Debtor was prevented from selling and closing units at realistic market levels. Consequently, many of the purchasers that paid 20% pre-construction deposits have attempted to cancel their contracts, rather than pay the original contract prices. Had the Debtor been able to reduce purchase prices as market conditions deteriorated, the Debtor believes that it would have been able to repay all or a substantial portion of the construction loan. The Northern also refused to consent to the Debtor's leasing of units and the implementation of a rent-to-own programs. As described later, because of Northern Trust Bank 30 plus year fiduciary relationship with Egozi and his family, the Debtor believes that Northern's mortgage lien on the Property may be subject to equitable subordination.

**D.      Status of Sale of Condominium Units, Contracts for Sale and Purchaser Deposits**

13.      As of the Petition Date, the Debtor closed on the sale of 3 Condominium Units. As of the Petition Date, there are two additional purchasers of Condominium Units that have advised the Debtor they are ready, willing, and able to close.   The Debtor has defaulted 4 purchasers and has approximately $400,000 in forfeited deposits currently available for use in paying Condominium assessments, completing units for rental or sale, and completing certain common area improvements and equipment purchases. The Debtor has 3 additional contracts involving deposits of $698,900 that are currently in litigation.  If the Debtor is successful in this litigation, the Debtor will have another $350,000 available for use.  Finally, the Debtor has an additional 4 contracts that may be defaulted, pursuant to which the Debtor would receive an additional $300,000 in forfeited deposits. In sum, the Debtor has the potential to recover in excess of $1,000,000 from the defaulted contracts.

## Description of Secured Indebtedness

**A.      Northern Trust Bank-7935 NBV**

14.      7935 NBV, LLC, as successor to Northern, asserts a first mortgage claim against the Property.  The nominal principal amount of this claim is approximately $14,000,000.  7935 NBV will contend that the fair market value of the Property securing its claim is approximately $8,000,000. 7935 NBV therefore asserts that it is substantially undersecured.  As a result, it has no clam to interest and its interest in the Property is subject to Section 506(c) recoveries for the cost of maintaining and preserving its collateral.

**B.      The CIELO Condominium Association**

15.      The CIELO on the Bay Condominium Association, Inc. (the "Association") is a not for profit corporation that is charged with the responsibility of managing the Property pursuant to the Florida Condominium Act and the recorded Declaration of Condominium, included, but not limited to collecting assessments from individual unit owners, including those units owned by the Debtor.  The Association has a lien on individual condominium units for unpaid assessments. The Debtor estimates that the gross assessments due the Association in period between the recording of the declaration and the Petition Date are approximately, $304,000.  Of this amount, approximately $118,000, representing six months of unpaid assessments is entitled to priority over any mortgage liens. Section 718.116(b)(1), Fla. Stat. (2009). The Debtor further believes that the Association's claim against the Debtor is subject to reduction for various expenses of the Association that were paid by the Debtor. The Association intends to apply these credits against the subordinated portion of its claims and assert the priority portion against the sale proceeds of each individual Condominium unit sale.

**C.      Other Secured Creditors**

16.    In addition to the 7395 NBV and the Condominium Association, Egozi may assert as secured claim as subrogee of Northern in the amount of approximately $3,000,000. Egozi may dispute the priority of 7395 NBV's claim based upon certain prior inequitable conduct by Northern. The project's architect, RVL Architecture Design, P.A. asserts a mechanic's lien against the Property, but the Debtor believes that such lien is subordinate to senior interests such that the claim is wholly unsecured. Finally, Whirlpool Corporation asserts a purchase money security interest in certain appliances that it delivered and installed on the Property. The Debtor cannot make a determination of the amount, validity and priority of this interest without further investigation into the value of the collateral and whether the collateral was incorporated into and became part of the Property.

## RELIEF REQUESTED AND GROUNDS FOR RELIEF

17.    The Debtor seeks authority to close on the sale of two additional units (the "Pending Sale Units") that may be scheduled to close in the near future. Although the Debtor believes that the sale of condominium units is in the ordinary course of its business and may be accomplished without a Court order, pursuant to the provisions of §363(c) of the Bankruptcy Code, it seeks authority for these sales in order to avoid any doubt regarding its authority, including the need to satisfy the requirements of title insurance companies, and in order to implement the provisions of §363(f) of the Bankruptcy Code.

18.    In addition, the Debtor continues to actively market the remaining Condominium Units (the "Unsold Units"). The Debtor intends to establish a procedure for the consummation of future sales of the Unsold Units that maximizes the return to the estate while protecting the interests of all creditors. As discussed above, the Debtor was thwarted in its attempt to sell the Unsold Units prior to the commencement of the case because of Northern recalcitrance in recognizing market realities. In order to sell the Unsold Units in the current market, the Debtor must be authorized to

use its business judgment to fix listing prices and determine prices at which it will execute binding contracts to sell, subject to certain terms and conditions. Debtor must assure the brokerage community that its offering prices are "real" and that brokers and purchasers can have reasonable assurance that the Debtor can deliver the condominium units at or near the asking prices.

19. Accordingly, the Debtor also requests that this Court, pursuant to §§ 363(b), (f), (m) and (n) and § 365 of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure, (i) approve the sales of the Pending Sale Units free and clear of all existing liens, claims, and encumbrances, and (ii) approve Procedures (defined below) for future sales of the Unsold Units free and clear of all existing liens, claims, and encumbrances.

## APPROVAL OF PENDING SALES

20. Seventeen of the Debtor's 35 Condominium Units were sold to buyers before construction of CIELO. Such buyers paid deposits of at least 20% of the purchase price. The Debtor has been working diligently to close such sales and maximize the recoveries from the Property in these difficult, yet improving, economic climate.

21. The Debtor has contracts for the sale of the Pending Sale Units that it entered into before the commencement of construction or during construction that have not yet closed but as to which the buyers are ready to close. The two proposed sales are: Carrenty, Unit 501 at an adjusted price of $650,000 and Kempinski, Unit 802 at an adjusted price of $575,000. The Debtor and its special counsel, Frankel and Blass, are working with the buyers (each, a "Purchaser") and their lenders to set closing dates for the sales. The Debtor desires to obtain all requisite authority to transfer title to these Purchasers in exchange for the payment of the applicable purchase price for such Purchaser's Pending Sale Unit.

22. Each of the proposed sales of the Pending Sale Units is for an amount that represents at the least the current fair market value of the Pending Sale Units. In addition, these

closing will resolve any potential disputes with the Purchasers regarding the enforceability of the contracts and claims to their deposits.

23.     The Debtor proposes to hold the "Net Proceeds of Sale" in interest bearing accounts pending an order of court determining the priority of the competing claims to the proceeds or stipulation of the all secured parties to a distribution of the proceeds, after deduction of normal and customary closing costs, any applicable commissions, and an amount equal to 6 months unpaid assessments, which amount shall be paid to the Association (the "Net Sale Proceeds").  Pursuant to applicable non-bankruptcy law, liens upon the Property shall attach in the priority that they exist.

24.     Section 363(b)(1) provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Courts generally defer to the sound business judgment of a debtor in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business. *See, e.g., In re Cont'l Airlines Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005); *In re Georgetown Steel co.,* LLC, 306 B.R. 549, 555 (Bankr. D.S.C. 2004).

25.     The Debtor, through the exercise of its business judgment, has determined that the sale of the Pending Sale Units is in the best interests of its estate. The Debtor has determined that the proposed purchase price offered by each Purchaser is the highest and best offer received, is reasonable, and represents fair market value.  Each of the sale contracts for the Pending Sale Units was negotiated in good faith and at arm's length between the applicable Purchaser and the Debtor. Accordingly, the Debtor believes that the sale of the Pending Sale Units is reasonable under the circumstances and in the best interests of its estate.

25.     The sale of the Pending Sale Units free and clear of liens satisfies the requirements of § 363(f)(1), (3), (4), and (5). The Debtor also believes that the sales meet the requirements of §

363(f)(2) because, upon information and belief, 7935 NBV has reviewed and approved these contracts and the proposed sale price for each of the Pending Sale Units is for an amount in excess of the fair market value for such Unit. *See Indiana State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F. 3d 108 (2d Cir. 2009) (affirming bankruptcy court approval of sale pursuant to § 363(f)(2) where collateral trustee consented to sale); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (approving sale free and clear of liens pursuant to § 363(f)(2)). The Association has also reviewed and approved the contracts and the proposed sale price and will consent to the sale provided it receives the unpaid assessments that accrued in the six months prior to the sale. The Net Sale Proceeds arising from the sale of such Units will be held in segregated accounts pending the determination of the parties respective rights therein.

26.     The Debtor also requests that this Court approve the Debtor's payment of normal and customary closing costs out of the gross proceeds of sale, including recording costs, title insurance premiums, the closing agent fee, the Debtor's attorneys fees relating to the negotiation of the contracts and the actual closing of the Units and the like.

27.     The Debtor further requests that the Court waive the 10-day stay set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure so that the order authorizing the sales will be immediately enforceable and that the closing for each Pending Sale Unit may occur as soon as possible.

## PROCEDURES FOR FUTURE SALES OF UNSOLD UNITS

28.     The Debtor further requests that the Court authorize a procedure for offering for sale and the closing of future sales of Unsold Units without the need for a hearing for each such sale, in the event that 7935 NBV, the Association, any other party secured by a lien on an unsold Unit, and any official statutory committee fail to file a timely objection to such sale and fail to

submit an overbid for such unsold Unit. Specifically, the Debtor requests that the Court approve the

following procedures (the "Procedures"):

a.    Periodically, the Debtor shall provide to (a) 7935 NBV, (b) the Association, and (c) any other party asserting a lien against the Property (collectively, the "Sales Notice Parties") a notice of Unsold Units and their proposed listing prices (the "Price Notice") and notice of Unsold Units for which a purchase and sale agreement has been received by the Debtor (the "Contact Notice"), which notice shall set forth the proposed gross cash sale prices offered by the prospective purchaser.

b.    Any Sales Notice Party objecting to the Price Notice or the Contact Notice must provide written notice to the Debtor within ten days of receipt of the Price Notice or Contract Notice.

c.    If the Debtor does not receive an objection to the Price Notice within such ten-day period, the Debtor may proceed to list the Unsold Units on the MLS or comparable market listing service and may execute a purchase and sale contact for such Unsold Unit at or within 20% of the Price Notice price. If the Debtor does not receive an objection to a Contract Notice with respect to a Unsold Unit, the Debtor may proceed to close the sale of such Unsold Unit free and clear of all liens, claims and encumbrances.  The Debtor shall pay all of the Net Sales Proceeds into a segregated interest bearing account. The Debtor may pay any and all normal and customary costs of closing and condominium assessments.  The Debtor will promptly file with the Court a statement of no objection  (a "Statement") as to the relevant Unsold Unit and  an "Agreed Order" authorizing such sale and serve both the Statement and the Agreed Order on the Sales Notice Parties.

d.    If any Sales Notice Party timely serves a written objection to a Price Notice or a Contract Notice with respect to any Unsold Unit, the Sales Notice Party shall be deemed to have submitted a offer to purchase the particular Unsold Unit for 20% greater than the price specified in the Price Notice or Contract Notice upon customary cash purchase terms or the terms set forth in the particular contract for purchase and sale.

29.    The Northern Trust mortgage requires the Debtor to sell the Condominium Units at

or above a specified release price (the "Release Price"), which varies according to the size and

location of the relevant Condominium Unit. Because of unforeseen market conditions, including the

collapse of the residential real estate market generally and the Miami condominium market in

particular, the Debtor must be authorized to sell units at prices that reflect the current realities of the

market. *See In re TOUSA, Inc.*, 393 B.R. 920, 924-25 (Bankr. S.D. Fla. 2008) (permitting sale of

residential lots below contract price in response to adverse market conditions). Absent such relief, the Debtor will be unable to continue sales of Unsold Units, which are crucial to the Debtor's reorganization efforts.

30.    As set forth above, the sales of the Unsold Units are in the ordinary course of the Debtor's business. Nevertheless, the Debtor requests approval of the Procedures, which are intended to expedite the sales process of Unsold Units and avoid delays and costs attendant to the filing of multiple sale motions, while at the same time protecting the rights of the Sales Notice Parties and other parties in interest. To the extent that any party in interest interposes an objection to a proposed future sale of an Unsold Unit, such party will have the opportunity to present to this Court the basis for its objection to such sale. Without the Court's approval of the Procedures, the Debtor will be hampered in its efforts to finalize existing prepetition contracts and to enter into and close postpetition contracts with prospective purchasers, which will likely result in loss of sales opportunities, to the detriment of all parties.

31.    Similar relief has been granted in other cases within this district and other districts. *See In re TOUSA, Inc.*, Case No. 08-10928-JKO (Bankr. S.D. Fla. Jan. 31, 2008) [D.E. #110], *In re Mercedes Homes, Inc.,* Case No. 09-11191-PGH (Bankr. S.D. Fla. Jan. 28, 2009 & Apr. 30, 2009) [D.E. #52 & 593]; *In re Towers of Channelside*, Case No. 08-bk-939-KRM (Bankr. M.D. Fla. Feb. 1 & 15, 2008) [D.E. # 31 & 54]; *In re WCI Communities, Inc.*, Case No. 08-11643 (KJC) (Bankr. D. Del. Aug. 5, 2008) [D.E. # 61].

WHEREFORE, the Debtor respectfully requests entry of an order: (i) authorizing the sales of Pending Sale Units free and clear of all liens, claims, and encumbrances, with the Net Sales Proceeds being retained in a segregated interest bearing account; (ii) establishing the Procedures for future sales of Unsold Units, free and clear of all liens, claims, and encumbrances, as set forth herein; and (iii) granting such other and further relief as may be just and proper.

Dated: April 22, 2010

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:    /s/ Michael L. Schuster
    Michael L. Schuster, Esq.
    Florida Bar No. 57119
    mschuster@gjb-law.com

      -AND-

Paul M. Bauch, Esq.
Florida Bar No.363677
BAUCH & MICHAELS, LLC
53 W. Jackson Boulevard, Suite 1115
Chicago, Illinois 60604
Tel: (312) 588-5000
Fax: 312-427-5709