

**ORDERED in the Southern District of Florida on January 06, 2011.**

_____
A. Jay Cristol, Judge
United States Bankruptcy Court

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 10-20733-BKC-AJC |
| | ) | |
| HARBOUR EAST DEVELOPMENT, LTD | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

### MEMORANDUM OPINION AND ORDER GRANTING DEBTOR'S MOTION TO APPROVE LEASE AGREEMENTS

THIS CAUSE came before the Court for evidentiary hearing on September 24, 2010 upon the Debtor's motion to approve proposed lease. The Debtor seeks approval of the Court to lease certain units of the Debtor, particularly unit 604, and further seeks approval for its leasing of all unsold units generally. The Debtor also requests the Court clarify whether leasing is within the Debtor's ordinary course of business pursuant to 11 U.S.C. §363(b)(2) or whether approval of leases must be obtained from the Court. As set forth in the following findings of fact and conclusions of law, the Court approves the Debtor's leasing of units. The Court does not believe leasing is considered, typically, to be in the ordinary course of the Debtor's business as a developer. However,

in these changing time and uncertain economy, it appears leasing has indeed become an act of necessity for developers and courts are, more and more, authorizing the leasing of units by developers. Notwithstanding, the Debtor is still required to obtain consent from NBV with respect to each proposed lease, which consent cannot be unreasonably withheld.

## FINDINGS OF FACT

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.

2. This is a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

4. On April 22, 2010, the Petition Date, the Debtor filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code.

5. Since the Petition Date, the Debtor has been operating its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

6. The Debtor is a limited partnership organized and existing under the laws of the State of Florida. (Ex. G, p. 6.)

7. The general partner of the Debtor is Harbour Development, LC. The manager/member of the general partner is Mario Egozi. (Ex. G, p. 6.)

8. The primary secured creditor is 7935 NBV, LLC ("NBV"), as successor in interest to Northern Trust Bank ("Northern Trust"). Northern Trust originated the loan (the "Construction Loan" or "Construction Loan Agreement") that financed construction of the Debtor's real estate development. (Ex. F.) On December 31, 2009, Northern Trust sold and assigned its interest in the Construction Loan Agreement to NBV.

9. The Debtor is the developer and owner of the luxury residential condominium development known as Cielo on the Bay ("Cielo" or the "Property") located at 7935 East Drive, North Bay Village. (Ex. 5, p. 6-10.) Cielo contains 35 residential condominium units (the

2

"Condominium Units"). Condominium Units range in size from 1,830 square feet to 1,915 square feet and are configured as two-bedroom, three bedroom, and penthouse units.[1] (Ex. 5, p. 10.) As of the Petition Date, 32 of the Condominium Units were unsold ("Unsold Units"). (Ex 5. P. 6-10.)

10.    Cielo was created pursuant to a condominium declaration, which was eventually recorded in January 2009. (Ex. 16.)

11.    As of the Petition Date, 8 of the Debtor's Unsold Units were leased to tenants. (Ex. 7.) On June 1, 2010, the Debtor entered into a 12-month lease of Unit 1104 (the "Lease of Unit 1104") at the rate of $2,800 per month. On June 2, 2010, NBV filed a motion ("Motion Objecting to Leasing") to nullify the Lease of Unit 1104 and prevent the Debtor from entering into future leases. [D.E. 70]. In that motion NBV noted that the Construction Loan required the Debtor to obtain NBV's consent prior to leasing any of the Condominium Units and that the Debtor was nonetheless required, pursuant to §363(b)(1), to obtain Court approval, after notice and a hearing, of any leasing of the unsold Units, because leasing is not within the ordinary course of the Debtor's business. NBV also reiterated its "strong objection to any rental program." [D.E. 70 at p. 7]. On June 8, 2010, the Debtor filed a response [D.E. 77] to the Motion Objecting to Leasing and argued that: first, leasing is within the Debtor's ordinary course of business and the Debtor does not need to obtain Court approval to lease any of its units; and second, even if leasing were not within the Debtor's ordinary course of business, the Lease of Unit 1104 was entirely reasonable and in the best interest of the estate. At the June 8, 2010 hearing on NBV's Motion Objecting to Leasing, the Court noted that NBV's blanket objection to any and all efforts by the Debtor to lease the Unsold Units created the appearance that NBV was acting in bad faith. (06/08/2010 Hr'g Tr. 18:17-19.) On June 25, 2010, NBV withdrew its Motion Objecting to Leasing. The Lease of Unit 1104 is presently in full force

---

[1]    CEILO contains one 4-bedroom unit of 3,704 square feet, which is combination of 2 units.

3

and effect and the Debtor has collected $8,400 in rental income and $5,600 in the form of a security deposit. (Exs. 10-12.)

12.   On August 11, 2010, the Debtor informed NBV that it intended to lease unit 604 to Sandra Bicknell at the rate of $2,900 per month and delivered to NBV her tenant application demonstrating her creditworthiness. (Exs. 14, 15, 18, 22, 23.) The Debtor also informed NBV that the Debtor planned to prepare unit 604 to be delivered to Ms Bicknell by installing wood laminate floors, painting the surfaces, completing the electrical, lighting, and air conditioning components, and installing bathroom accessories.[2] (Ex. 22.) The total cost of these items was budgeted at $8,900, substantially all of which would be funded by Ms Bicknell's three-month security deposit ($8,700). (Ex. 22.)

13.   On August 11, 2010, NBV informed the Debtor that it objected to leasing unit 604 to Sandra Bicknell, on the grounds that (1) leasing Unsold Units, in general, diminishes the value of the Property, and (2) the improvements that the Debtor sought to make to prepare unit 604 for leasing were unnecessary and would need to be "torn out" in the event that Unit 604 is sold. (Hr'g Tr. 52-54.)

14.   On August 18, 2010, the Debtor filed its Motion to authorize the lease of Unit 604 to Bicknell and to generally authorize the leasing of units in the building. [D.E. 159.] On August 27, 2010, NBV filed its objection to the motion. [D.E. 172.]  On August 30, 2010, upon NBV's motion, the Court set an evidentiary hearing on the Motion for September 15, 2010. [D.E. 175.]  At the hearing, the Debtor presented the testimony of its principal Mario Egozi and its real estate broker Patrick O'Connell.  NBV presented the testimony of its expert appraiser Michael Cannon.  NBV also tendered the affidavit of Bernard Thibault in support of its objection.  The Debtor sought to strike the affidavit but this Court has denied the motion by separate order.

---

[2]   Presently, unit 604 is not ready to be delivered to a tenant. The floors are unfinished, the lighting, air conditioning, and electrical work has not been finalized, and there are no appliances in the unit.

15. On October 5, 2010, the Court entered an order authorizing, in part, the use of cash collateral. In paragraph 18 of this order, the Court approved the Debtor's leasing of Unit 604 to NBV on the same terms and conditions as the proposed Bicknell lease. [D.E. 244.]

I. **Mario Egozi's Testimony.**

16. Egozi is a professional architect trained at the Pratt Institute in New York. He has taken professional courses at NYU in real estate development. Egozi has 25 years of experience in the construction and design of real estate. (Tr. p. 20.) (Ex. 5, p. 6.) The Court finds Egozi is forthcoming and credible.

17. In the New York market, Egozi was involved in purchasing and developing and selling townhouse condominium projects. In the Miami market, in addition to Ceilo, during the past five to six years, Egozi has been involved in a 96 unit garden-style apartments community that was purchased and converted to condominiums in Broward County. (Tr. p. 20.) Egozi has also been involved with a trailer park community in Sweet Water, Miami for the past 20 years. (Tr. p. 20, 21.)

18. Egozi is from Miami and is familiar with the real estate market. (Tr. p. 21.)

19. The Construction Loan Agreement required Northern Trust's consent prior to leasing of the units but also contemplated the leasing of units by the Debtor. (See Ex. F at section 10.10.) In connection with obtaining the Construction Loan from Northern Trust, Egozi submitted both the Condominium Declaration and a Prospectus to Northern Trust for approval. (Exs. 16 and 21.) (Tr. p. 23.)

20. The Declaration permits the leasing of units by unit owners. (Ex. 16 at sections 17.3, 17.4.). With respect to the developer's ability to lease units, the Prospectus provides:

> **Leasing of Developer-Owned Units**
> **THE UNITS MAY BE TRANSFERRED SUBJECT TO A LEASE.**
> See Section 17.2 of the Declaration of Condominium.
>
> The Developer does not at this time intend to engage in a program of renting or leasing unsold Units, but reserves the right to do so in the future. In the

> event any Unit is sold prior to the expiration of the term of a lease, title to such Unit will be conveyed subject to the lease and the purchaser will succeed to the interests of the applicable landlord. If any Unit is sold subject to a lease, a copy of the executed lease will be attached to the Agreement For Sale in accordance with the terms of Florida Statutes, Section 718.503(1)(a)(4). If a Unit has been previously occupied, the Developer will so advise a prospective purchaser, in writing, prior to the time that the purchaser is requested to execute an Agreement for Sale, if required by law.

(Ex. 21, p. 4.)

> \*   \*   \*
>
> Leasing of Units shall be subject to the prior written approval of the Association. Every lease of a Unit shall specifically require a deposit from the prospective tenant in an amount not to exceed one (1) month's rent ("Deposit"), to be held in an escrow account maintained by the Association, provided, however, that the Deposit shall not be required for any Unit which is rented or leased directly by or to the Developer. No lease shall be for a term of less than three (3) months and a Unit Owner may not lease its Unit more than two (2) times in any calendar year period, regardless of the lease term. The foregoing requirement shall not apply to a Unit rented or leased directly by or to the Developer.

(Ex. 21, p. 6.)

21. Northern Trust approved the Prospectus. (Tr. p. 23.) Northern Trust is therefore considered to have had knowledge that units in the building could be leased and approved the developer's implementing a leasing program. (Ex. 21, p. 4.) At the time the project was conceived, Egozi did not intend to lease units but to sell them. (Tr. p. 23.) Beginning in February of 2009, as the economic crisis swept the country, Egozi requested that Northern Trust allow him to change the business plan and asked for flexibility to deal with the crisis. Northern Trust did not respond to Egozi's request to lease the building (Tr. p. 23.)

22. Debtor began leasing units in the building in April of 2009. (Tr. p. 25.) Ten units in the building are presently leased to financially stable tenants who are primarily professionals, doctors, lawyers, or business owners. (Tr. p. 26.) Egozi is personally involved in reviewing all leases and interviewing all tenants. (Tr. p. 26.) Egozi is also looking for tenants who may be possible buyers. (Tr. p. 26.) Having the right tenant in the building may add to its value. (Tr. p. 26-27.)

23. Two of the third party owners of units in the building are currently leasing out their units. (Tr. p. 28.) The Condominium Declaration does not prohibit purchasers of units from leasing their units. (Ex. 16 at sections 17.3, 17.4.). The Debtor has not turned down any prospective purchasers because of an unavailability of units to sell. (Tr. p. 28-29.) Debtor has a sufficient inventory of unit sizes and mix throughout the building to offer prospective purchasers. (Tr. p. 30.)

24. The leasing program will not prevent the Debtor from going forward with a contract for sale. (Tr. p. 30.) A number of the Debtor's leases are month-to-month, and can be terminated by 30-days notice. (Tr. p. 30.) Debtor's leases have various maturity dates which expire over the next year. (Tr. p. 30.)

25. The Debtor, in its business judgment, could obtain more inventory for sale by simply not renewing the leases. (Tr. p. 31.)

26. CBRE is a national real estate advisory and marketing firm. Northern Trust retained CBRE to sell its note. (Tr. p. 34.) The Debtor gave Northern Trust information on the building which CBRE incorporated into its brochure. (Ex. 5.) (Tr. p. 34.) The CBRE Confidential Offering Memorandum ("COM") contains a description of the Cielo project and the market. (Tr. p. 34.) CBRE's executive summary on page 10 is consistent with the Debtor's opinion of the most advantageous ratio of condominiums for sale and for lease. (Ex. 5.) (Tr. p. 34-35.)

27. CBRE's prospective schedule of cash flows on page 11 of the COM served as the model for the Debtor's business plan. (Ex. 5.) (Tr. p. 35.) CBRE proposed that all units in the project be leased in 2010 and then sold out as the market recovered during the three years 2011, 2012 and 2013. (Ex. 5.) These pro formas are reasonable. (Tr. p. 36.) Debtor has had no difficulty leasing the project, has sufficient street traffic and has achieved market rate rentals. (Tr. p. 36.)

28. The Debtor will incur no additional operating expenses in leasing the building as opposed to allowing it to remain vacant. (Tr. p. 37-38.) Debtor can improve units at minimal expense

to make them occupancy ready. (Tr. p. 38.) Debtor is obligated to pay taxes, electricity and maintenance on the units whether they are occupied or not. (Tr. p. 38.) Debtor's repair history has demonstrated that it incurs greater expenses on vacant units than occupied units. (Tr. p. 38.) Debtor can make 10 units ready for occupancy at an expenditure of $150,000.00. (Tr. p. 38.) Debtor is proposing to improve units with polished concrete floor which can be done at minimal expense compared to other floor finishes and gives maximum options for future buyers because they don't have to remove finishes. (Tr. p. 38.) Debtor will generate approximately $30,000 a year in gross revenue for each leased unit. (Tr. p. 39.) Debtor will cover costs of improvements within 6 months from increased rental income. (Tr. p. 39.) Tenants pay their own utilities. (Tr. p. 39.) Leasing will shift the cost of running air conditioning and electric for units to the tenants. (Tr. p. 39.) Debtor has flexibility to upgrade finishes and units upon request of a purchaser or renter. (Tr. p. 40.)

29. Debtor has had renters in the building since May of 2009. (Tr. p. 40.) Tenants have not damaged the common areas. (Tr. p. 40.) Tenants have caused no internal damage to units as a result of occupancy. (Tr. p. 40-41.) Debtor has turned over units and moved in new tenants. (Tr. p. 41.) In fact, Debtor turned over a unit and within two weeks of vacancy at no cost. (Tr. p. 41.) In cases where Debtor has been required to refurbish a unit, it did so at a cost of $1,000. (Tr. p. 42.)

30. Egozi testified that Debtor's rental of units will not make the Project more difficult to sell. (Tr. p. 42.) Having occupants, including renters, in the building contributes to the desirability of the building. (Tr. p. 42-44.) He believes it is important for a building to appear lived in and occupied in this market. (Tr. p. 43.) The first question in the market place is whether people want to live in the project; not necessarily whether they want to buy or rent. (Tr. p. 43.) Prospective purchasers are not demanding a discount on units due to the fact that they are being or have been rented. (Tr. p. 44.) Property is discounted not on account of how it was used but because of its condition. (Tr. p. 44.) If a unit is in good repair, there are no perceivable discounts based on the

status of it being used or previously occupied. (Tr. p. 45.) In fact, units that are shown while staged and occupied usually improve the saleability of the units. (Tr. p. 45.)

31.   Renters in the building are potential sales prospects. (Tr. p. 45.) The most important factor to buyers in the current marketplace is stability of the project. (Tr. p. 45.) Buyers are concerned with whether there are a large number of foreclosures in the building and whether condo assessments are being paid to the association. (Tr. p. 45-46.)

32.   The current tenants of the Cielo project appear to be satisfied with management and the condition of the project. (Tr. p. 46.) (Exs. 2-4.) Debtor has filed all of its operating reports. (Tr. p. 46.) (Exs. 9-12.) The operating reports reflect payment of necessary operating costs including condominium association assessments, maintenance and repairs. (Tr. p. 46.) (Exs. 9-12.) The Debtor is operating the building as efficiently as an outside management company. (Tr. p. 46-47.) (Exs. 9-12.) The condominium association budget for the Cielo has proven to be accurate and the association will be able to cover the cost of insurance, maintenance, professional assistance, and management costs. (Tr. p. 47.) Debtor is proposing to turn the association over to unit owner control to satisfy lender's financing standards. (Tr. p. 47.) Debtor currently controls the association. (Tr. p. 48.) The association has hired a professional manager to manage the association and operate the project. (Tr. p. 48.)

33.   Debtor has performed market studies regarding other condominium developers' leasing strategies. (Tr. p. 48-49.) (Ex. 13.)

34.   Leasing is a means of maintaining and preserving a project until value is recovered through future sales of units at higher values. (Tr. p. 49.) (Ex. 13.)

35.   Debtor sent a series of emails (Exs. 14, 15, 17, 18, 19, 20, 22, and 23) to NBV requesting approval of two proposed leases in the Project to Kathy Petrovich and Sandra Bicknell.

36. Both of the tenants had acceptable credit and the leases were otherwise consistent with market prices. (Tr. p. 50.)

37. The Petrovich lease was for a monthly rental of $2,700. This is an increase of $100 per month over the previous tenant. (Tr. p. 50.) NBV approved the proposed lease for Kathy Petrovich which replaced an existing tenant. (Tr. p. 49-50.)

38. Sandra Bicknell offered to lease Unit 604 for $2,900 a month. (Tr. p. 51.) Ms. Bicknell had agreed to advance three months rent. (Tr. p. 51.) Bicknell had excellent credit. (Tr. p. 51.) NBV refused to approve her lease. (Tr. p. 51.)

39. The grounds given for NBV's refusal to approve the Bicknell lease is that leasing devalues the building. (Tr. p. 51-52.)

40. As a result of NBV's refusal to approve the Bicknell lease, Bicknell terminated her offer and found an alternative apartment to rent. (Tr. p. 52.) Debtor has received numerous inquires regarding the availability of leases in the building. (Exs. 24, 25 and 27) (Tr. p. 52.)

41. Debtor believes it could lease all the available units in the current market. (Tr. p. 52-53.)

42. Debtor's current asking rents are $2,900 for flats, and $2,500 for townhouses. (Tr. p. 53.)

43. If the building is not more than one-third occupied, a vacancy insurance premium of approximately $80,000 of additional costs would be incurred. (Tr. p. 54.)

## II.  Patrick O'Connell's Testimony

44. Patrick O'Connell has worked as real estate broker for 13 years in the Miami, Coral Gables and Miami Beach Market. (Tr. p. 60.) He is employed by Esslinger Wooten Maxwell Realtors, a real estate brokerage. (Tr. p. 60.) He is licensed real estate broker. (Tr. p. 61.) He is the listing agent for Cielo. (Tr. p. 61.)

45. Real estate sales prices in the North Bay Village Market have been depressed, but the rental market is strong. (Tr. p. 62-63.)

46. The rental absorption rate for North Bay Village is 16%, which is twice the rate of Miami-Dade County as a whole. (Tr. p. 63.)

47. O'Connell has worked directly with two projects (Metropolitan Miami and Cynergi Lofts) that have successfully instituted rental programs in response to the depressed sales market. (Tr. p. 64-74.)

48. The trend in the Miami-Dade County leasing market is that lease prices are rising. This is caused by a decrease in the number of units available for rent. (Tr. p. 66-67.)

49. He believes Cielo is different from the typical rental buildings because of the amenities and size of the units. Cielo is likely to attract professionals with significant salaries who are replacing a primary residence. (Tr. p. 67-68.)

50. O'Connell could find no data that would suggest that units that have been leased sell for less than units that have never been leased or otherwise occupied. (Tr. p. 69.) The multiple listing service does not compile data that would reflect the difference between value of a unit that had been leased and a unit that had never been leased. (Tr. p. 76.)

51. He did state that an occupied building, whether occupied by owners or renters, is more attractive to both buyers and renters than an unoccupied building. (Tr. p. 70.)

52. Other than having a unit cleaned and repaired, there is nothing in particular that would affect the value of a leased (as opposed to vacant) unit to a potential purchaser. (Tr. p. 70.)

### III. Michael Cannon Testimony

53. Michael Cannon is an expert in market analysis, appraisal and condominium management (Tr. p. 84.)

54.     NBV hired Canon to perform a market study, market analysis and the intended use was to inform NBV of the market conditions and net sell-out values (Tr. p. 85.). Mr. Cannon's original appraisal report did not include any discount for the units in Cielo that had been previously leased. (Ex. A.)

55.     As of April 2010, Cannon's opinion of the present value of the Property, assuming a sell out over 2.5 years without renting any units, was $7,953,386, or approximately $250,000 per unit. (Ex. B.) (Tr. p. 90.)

56.     Mr. Cannon's opinion is that the market would absorb the 32 units over a 2.5 year period (Tr. p. 88.)

57.     Subsequent to his initial report, Cannon performed an analysis of the effect of the Debtor's interim leasing program on the value of the Property. Cannon opined that a leasing program devalues condominium property as whole, because buyers do not want to move into a building that is not owner occupied. (Tr. p. 99-100.).

58.     Cannon also opined that a Cielo unit that has been leased is worth 5% less than a unit that has not been leased. Cannon based this opinion on the assumption that a buyer in the Cielo price range has discretionary income and would prefer to install new appliances and furnishings rather than use the "used" or "old" appliances that were used by the Cielo renter. (Tr. p. 102-105.) Cannon's opinion was not supported by the evidence.

59.     Cannon's 5% discount is not based on a professional estimate of how much it would cost to repair or make Cielo's leased units ready for sale. The 5% discount is a product of his market study on the difference in sales prices between the yearly average price of all new condominiums sold and the yearly average price of used condominiums sold in Dade County. (Tr. p. 125.)

60.     Cannon's analysis considers no factors other than whether the condominium was brand new or used. He does not take into consideration how the condominium was used—whether

12

it was rented or lived in by an owner. He does not consider the duration for which the condominium had been "used". He did not compare the size, quality, or location of the used versus new condominiums that he considered.

61.     Cannon defines a "used" condominium as simply one that has been lived in. (Tr. p. 125.)

62.     Cannon concedes there are a million factors that affect what a purchaser pays for a condominium. (Tr. p. 127.) There is an analysis that could be used to determine what factors affected a price differential between similar condominiums – a "pared sales analysis" (Tr. p. 127.) But Cannon did not perform a pared sales analysis with respect to sales of previously-leased versus vacant condominiums. He simply examined the average sale price of "new" versus "used" condominiums.

63.     There is no specific data that Cannon pointed to or analysis that he performed that supports his conclusions that a new Cielo condominium that was leased for 1 or 2 years would sell for 5% (approx $25,000 based on his approximate $500,000 retail sales price) less than if the unit were not leased. Cannon simply concluded that, in his opinion, a used condominium would sell for less than a new condominium, on average. Ultimately, Cannon admitted that you just do not know why prices are at any certain level for various condominium sales, you have to do an individual investigation (Tr. p. 128.)

64.     Cannon concluded that a leasing program instituted during the 2.5 year sell out period would bring in additional rental revenue of $596,250. Cannon then concluded that, with the cost of finishing the units and preparing them for rental, the 5% reduction in ultimate sell-out prices, and the cost of maintaining the units, the present value of the Property, if rented during the 2.5 year sellout period, would be $8,046,014. (Ex. C.)

13

65. Although Cannon summarizes the difference between engaging an interim rental program and having no interim rental program as a "wash," his report actually concludes that the value of the estate would be enhanced by $92,628 by instituting leasing during the 2.5 year sell out period. (Exs. B, C.)

## CONCUSIONS OF LAW

First, the Court concludes that the COM (Ex. 5.), which was prepared by agents of Northern Trust at the time that Northern Trust owned the Construction Loan, is admissible as evidence herein, and NBV's objection thereto is overruled. The COM is a market analysis prepared by a national real estate consulting firm from identified market data. The COM supports a finding that the Debtor's proposed plan to lease and then sell the Unsold Units over time is feasible and will maximize the value of the estate. *See Rogers v. First Oakbrook Corporate Syndicate*, No. C 95-2593 FMS, 1996 U.S. Dist. LEXIS 7993, at *13-14 (N.D. Cal. June 4, 1996); 4 Wigmore on Evidence, §§ 1081, 1084.

Second, the Court believes NBV may not prohibit the Debtor's leasing of units by arbitrarily withholding its consent under provisions of the Construction Loan Agreement wherein it is given the right to approve leases. Such arbitrary refusal appears to be motivated by NBV's desire to thwart the Debtors reorganization; and, such conduct is not consistent with the policies of the Bankruptcy Code. Such arbitrary conduct also interferes with the Debtor's reorganization efforts. *See, e.g., In re Independence Village, Inc.,* 52 B.R. 715, 723 -724 (Bankr. E.D.Mich. 1985).

Though leasing has not typically been considered to be conduct in the ordinary course of a developer's business, more and more, in these troubled times, leasing is an appropriate way for a developer to combat depressed condominium sales and maximize revenues for the benefit of all creditors. Without determining whether the leasing of vacant Unsold Units is within the ordinary course of the Debtor's business in the context of 11 USC 363(c), the Court believes the Debtor is

nonetheless authorized to lease the vacant Unsold Units. The Debtor was engaged in leasing unsold units pre-petition, and NBV was aware of this. The Condominium Declaration, the Prospectus, and the Construction Loan all contemplate the Debtor's leasing of its units, particularly in the context of a depressed sales market. Other developers, similarly situated to the Debtor, have instituted interim leasing programs to combat the depressed condominium sales market. Thus, the interim leasing of Unsold Units is a course of action taken by developers in this depressed real estate market and is authorized under the Code.

Having determined that the Debtor is authorized to lease vacant Unsold Units, such conduct on behalf of the Debtor should not be unfettered. While NBV has failed to demonstrate a good faith objection to the Debtor's proposed leasing program in general, it nonetheless has the right to contest or object to a proposed lease if the terms of such lease are not reasonable. Accordingly, the Court will require that, for each proposed lease, the Debtor seek to obtain NBV's approval. If NBV does not approve a particular proposed lease, it shall state in writing, filed with the Court, the bases for its non-approval and request a hearing on its objection. The Court will schedule a hearing and, on a lease by lease basis, the Court will determine whether approval of the lease is being withheld unreasonably or arbitrarily or whether there is a good faith basis to deny approval of the lease.

66. NBV has failed to demonstrate that leasing the units will diminish the value of the Property. In fact, NBV's own expert's analysis concludes that temporarily leasing unsold units over a 2.5 year controlled sell-out period would result in a net benefit to the estate in the amount of $92,628. (Compare Exs. B and C.) Thus, NBV's argument that leasing units will diminish the value of its collateral is contradicted by NBV's own expert witness's testimony.

67. Cannon's opinion testimony that the value of the Debtor's condominium units diminishes by 5% if they are leased is unsupported by the record. Cannon failed to demonstrate that his conclusions regarding the 5% diminution caused by leasing could be independently verified by

15

employing his methodology of comparing average sale prices of new versus used condominiums. *Id*. This Court concludes "that there is simply too great an analytical gap between the data and the opinion proffered" and is not persuaded by Mr. Cannon's expert testimony. In particular, Cannon's testimony regarding the 5% diminution is unreliable for many reasons, including the following:

    a. Cannon testified that a leasing program in a condominium development devalues the condominium property as a whole, because buyers don't want to move into a building that is not owner occupied. (Tr. p. 99-100.) He based this opinion on various news and journal articles. He offered no data or other analysis to support his conclusions that a buyer in the Cielo price range would rip out the older appliances and furnishings when moving into a finished unit that had been leased. Cannon then testified that the 5% diminution is not actually based on the cost to repair or make Cielo's leased units ready for sale, but rather the 5% figure is actually a product of his market study on the difference in pricing between the yearly average price of all *new* condominiums sold in Miami-Dade County and the yearly average price of *used* condominiums sold in Miami-Dade County. (Tr. p. 125.)

    b. Cannon defined a "used" condominium simply as one that has been lived in. (Tr. p. 125.) Neither his data nor his analysis considered any factors other than if the condominium was brand new or used. He did not take into consideration *how* the condominiums at issue in his data pool were used—whether they were rented or occupied by owners. He did not consider the duration for which the condominium had been "used". He did not compare the size, quality, or location of the used versus new condominiums that he considered. He ultimately admitted that there are a million factors that affect what a purchaser pays for a condominium. (Tr. p. 127.)

16

    c.    Cannon acknowledged that there is an analysis—a "pared sales analysis"—that he could have performed to determine what factors affected a price differential between sales of condominiums that had been rented and those that had not been rented. (Tr. p. 127.) But he did not perform a pared sales analysis with respect to sales of leased versus vacant condominiums. He simply examined the difference between the average sale price of "new" versus "used" condominiums in Miami-Dade County in 2009. The fact that the average new condominium sells for more than the average used condominium is not relevant to the question of whether leasing high-end, luxury condominiums like those in Cielo to well-qualified renters will diminish their value.

    d.    Cannon simply concluded that, in his opinion, a used condominium would sell for less than a new condominium, on average.

81.    While the Court is not persuaded leasing unsold Cielo units will diminish their value by 5%, the Court does believe that a leasing program is feasible and will result in net benefit to the estate. Therefore, NBV is adequately protected and the Debtor is authorized to lease units in the building. The Court finds that the leasing program is likely to enhance the value of the estate by at least $450,000.[3] This amount is calculated by removing the 5% ($25,000) diminution in value for each of the 15 leased units that are sold.

For the reasons set forth herein, it is

ORDERED AND ADJUDGED that the Debtor's motion to approve proposed lease is GRANTED, and the Debtor is authorized to lease units in Cielo, as the leasing revenue is greater than any perceived decline in the value of the underlying property caused by the leasing. As a result, NBV is adequately protected and its objections are overruled. It is further

---

[3] This amount is calculated as the sum of $92,628 net benefit to the estate as calculated by Mr. Cannon (Ex. C.) plus the $375,000 of sales revenue that was diminished under Cannon's analysis (15 leased units X $25,000).

ORDERED AND ADJUDGED that, notwithstanding the foregoing authorization to lease, the Debtor shall seek NBV's approval for each new lease proposed in the future. If NBV does not approve a particular proposed lease, it shall state in writing, filed with the Court, the bases for its non-approval and request a hearing on its objection. The Court will schedule a hearing and, on a lease by lease basis, the Court will determine whether approval of the lease is being withheld unreasonably or arbitrarily or whether there is a good faith basis to deny approval of the lease.

###

Copies furnished to:

Michael Schuster, Esq.
Jose Casal, Esq.

Attorney Schuster is directed to immediately serve a conformed copy of this order upon all interested parties upon receipt of same and shall file a certificate of service of same.