UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flbc.uscourts.gov

In re:                                                                                  Case No.  10-20733-BKC-AJC

HARBOUR EAST DEVELOPMENT, LTD.                         Chapter 11

     Debtor.
_____/

**DEBTOR'S SECOND MOTION FOR ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(C)(2) AND (II) AUTHORIZING THE RECOVERY OF MAINTENANCE AND PRESERVATION EXPENSES FROM PROPERTY SECURING ALLOWED CLAIMS PURSUANT TO 11 U.S.C. § 506(c)**

**[HEARING REQUESTED FOR MARCH 1, 2011]**

Harbour East Development, Ltd. (the "Debtor"), debtor and debtor in possession, respectfully requests the entry of an order (1) authorizing the use of cash collateral pursuant to 11 U.S.C. § 363(c)(2), and (2) authorizing the recovery of maintenance and preservation expenses from property securing allowed claims pursuant to 11 U.S.C. § 506(c):

**SUMMARY OF RELIEF SOUGHT**

Debtor seeks authority to use cash collateral, rental income and defaulted purchase agreement deposits—both to the extent that the Court determines that such assets constitute cash collateral—to pay operating, sales, and marketing expenses and to fund capital improvements to the Property, primarily to make Condominium Units ready for occupancy as rentals. Debtor contends that such use may be authorized under Section 363(c)(2) and 506(c) because the expenditures will enhance the value of the underlying collateral and generate future rental income far in excess of the expenditures; therefore, all entities with an interest in cash collateral may be adequately protected by the granting of a replacement lien upon the future rents, and

because the expenses to be paid are reasonable, necessary costs and expenses of preserving the property securing allowed claims and such expenses are otherwise recoverable from the property.

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this motion (the "Motion") pursuant to 28 U.S.C. §§ 157 and 1334.

2. The subject matter of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1408.

4. The statutory predicate for the relief sought by the Motion is §§ 361, 363 and 506 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001.

## BACKGROUND

**A.     General Background**

5. On April 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6. The Debtor has been operating its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

7. As of the date hereof, no creditors' committee has been appointed in this case. In addition, no request for the appointment of a trustee or examiner has been made.

8. The Debtor is a limited partnership organized and existing under the laws of the State of Florida.

9. The general partner of the Debtor is Harbour Development, LC, a Florida limited liability company. The manager/member of the general partner is Mario Egozi ("Egozi").

**B.     Debtor's Rental Program**

10.     As of the Petition Date, the Debtor had unexpired lease agreements with nine residential tenants. The Debtor has turned over all of the Condominium Units as leases expired and has rented two additional units during the case. The Debtor currently has 11 Condominium Units under lease and pending lease proposals on four additional Condominium Units.

11.     NBV has continually obstructed the Debtor's efforts to lease the Condominium Units. As discussed below, in April of 2010, the Debtor sought authority to use cash collateral to make additional units ready for a rental pool. NBV objected to the Debtor's use of cash collateral to make units ready for the rental pool. NBV made these objections even though the leasing program would generate revenue to pay all of the Association assessments and real estate taxes with respect to the Condominium Units. NBV obstruction of the leasing program from the inception of the case has injured the estate in an amount in excess of $400,000.

12.     On June 2, 2010, NBV filed a Motion to invalidate a lease between the Debtor and a tenant for Condominium Unit 1104. [D.E. #70 and Debtor's Response at D.E. #77]. After hearing, NBV withdrew this Motion [D.E. #92]. The Debtor has since collected over $22,000 with respect to the lease of this Condominium Unit. When Debtor received offers for two new leases, NBV objected to the lease of a previously vacant unfinished Condominium Unit, notwithstanding that the Condominium Unit was to be finished with cash provided by the tenant.

13.     On August 18, 2010, Debtor filed a Motion to authorize the lease of this Condominium Unit and the leasing of the Condominium Units generally (the "Leasing Motion"). [D.E. #159]. On August 27, 2010, NBV filed its objection to the Leasing Motion arguing that leasing the Condominium Units, which would create $1 million a year in potential revenue for the estate, would decrease the value of the Property. [D.E. #172]. On September 24, 2010, the Court conducted an evidentiary hearing on the Leasing Motion. On January 6, 2011, the Court

issued its Memorandum Opinion and Order authorizing the Debtor's leasing of Condominium Units in the Project on the terms and conditions set forth in the Order. (the "Leasing Order") [D.E. #338].

14. Since the date of the Leasing Order, with the assistance of EWM Realty, the Debtor has commenced an active marketing program to lease Condominium Units in the Project. NBV's objections, however, resulted in the Debtor missing the lucrative winter leasing season and further injured the estate. Debtor has received a strong response to its marketing efforts and has accepted four proposals for new leases. Debtor receives inquires from interested tenants on an almost daily basis. Debtor believes that it would be in the best interest of the estate to complete additional Condominium Units to a "rent ready" condition and enter into additional leases with respect to these Condominium Units. The leasing of additional Condominium Units will create a source of revenue to pay real estate taxes, sales and leasing expenses, and complete capital projects, including in particular the build out of additional Condominium Units for sale or rent. Debtor proposes to complete as many Condominium Units as the market demands. Desperate in its attempt to continue to stifle the Debtor's reorganization, NBV has now filed a "Motion for Clarification" of the leasing Order that would interfere with and limit the Debtor's ability to maximize the value of the estate by exercising its business judgment to respond to changing market conditions. [D.E. #348]. The Court should reject this attempt by NBV to interfere with the Debtor's efforts to maximize the value of the estate.

C. **Debtor's Motions for Authority to Use Cash Collateral**

15. On May 11, 2010, the Debtor filed its first Motion for order authorizing the use of cash collateral pursuant to 11 U.S.C. § 363(c)(2), and (2) authorizing the recovery of maintenance and preservation expenses from property securing allowed claims pursuant to 11 U.S.C. § 506(c). [D.E. #33] (the "First Cash Collateral Motion"). In the First Cash Collateral

Motion, the Debtor sought to use cash collateral to make Condominium Units occupancy ready for purposes of leasing them to generate income to pay the operating expenses of the Project and to preserve and enhance the value of NBV's collateral. The Debtor budgeted $162,500 to complete Condominium Units for occupancy during a 6 month period. *Id*. The Debtor budgeted total rental revenue of $196,400 for the same period based upon an estimated doubling of the gross monthly rent by the end of the period. *Id.* On May 17, 2010, NBV filed its Objection to the Debtor's proposed use of cash collateral to, *inter alia*, make Condominium Units occupancy ready and to the rental program in general. [D.E. #47]. NBV objected to the use of cash collateral primarily on the grounds that leasing would devalue the Condominium Units and that the Debtor was proposing to spend too much to improve the Condominium Units to occupancy ready. *Id*. As noted, NBV objections to the Debtor's use of cash collateral to make Condominium Units occupancy ready has injured the estate to the extent of approximately $400,000 in lost revenue.

      16.    As a result of NBV's objections, Debtor and NBV negotiated a series of "bare bones" cash collateral orders that provided for the operation of the Property, but made no provision for capital improvements or the improvement of Condominium Units to occupancy ready condition. [D.E. #373, 117 and 141]. After efforts at negotiating a comprehensive cash collateral order failed, on August 18, 2010, the Debtor sought to present the First Cash Collateral Motion for evidentiary hearing. In connection with this hearing, the Debtor and NBV negotiated a more comprehensive Fourth Interim Cash Collateral Order [D.E. #244]. This order authorized the Debtor to proceed with a number of capital projects that have significantly enhanced the value of the Property: (1) dock renovation; (2) exterior deck waterproofing; (3) gym, lobby and community room furnishings; (3) Ready/Model Unit build-out. *Id*. The Debtor has completed all of these projects within budget, with the exception of the dock renovation, which is currently in

progress, but which the Debtor expects to complete within budget. Since the Court had not yet ruled on the Leasing Motion, NBV continued to object to the Debtor's use of cash collateral to implement a leasing program.

## DESCRIPTION OF SECURED INDEBTEDNESS

**A.     Northern Trust Bank-7935 NBV**

17.     NBV, as successor to Northern, has filed a secured claim in the amount of $15,598,530.54. NBV asserts a first mortgage lien against the Property to secure its claim. NBV also asserts an interest in the rents of the Property and a security interest in the forfeited purchase agreement deposits and other personal property of the Debtor. NBV contends that the fair market value of the Property securing its claim ranges between $8,000,000 and $11,100,000. NBV therefore asserts that it is substantially undersecured. As a result, it has no claim to interest and its interest in the Property is subject to Section 506(c) recoveries for the cost of maintaining and preserving the Property.

18.     The Debtor is disputing the priority of NBV's claim based upon certain prior inequitable conduct by Northern and NBV's conduct with respect to the case. Moreover, Northern and NBV failed to file UCC-1 financing statements and failed to enter depository account control agreements with the Debtor or the Debtor's escrow agent. Therefore, the Debtor has filed an adversary proceeding seeking to avoid the security interest of NBV in the Debtor's personal property assets, including appliances and the purchase agreement deposits. *Harbour East Development, Limited v. 7935 NBV, LLC, et al.*, 10-03584-AJC. Debtor therefore disputes NBV's assertion that the purchase agreement deposits and a portion of the rents attributable to the use of the appliances and other personal property are NBV's cash collateral.

B.  **The CIELO Condominium Association**

19. The CIELO on the Bay Condominium Association, Inc. (the "Association") is a not-for-profit corporation that is charged with the responsibility of managing the Property pursuant to the Florida Condominium Act and the recorded Declaration of Condominium, including, but not limited to, collecting assessments from individual condominium unit owners, including the Debtor. The Association has a lien on individual condominium units for unpaid assessments. Section 718.116 (5)(a), Fla. Stat. (2009). As of the Petition Date, six months of unpaid assessments were entitled to priority over any mortgage liens from the proceeds of sale of Condominium Units. Section 718.116(b)(1), Fla. Stat. (2009)[1]; *In re Gonzales*, 2010 WL 1571172 (Bankr. S.D. Fla. 2010). Moreover, pursuant to the 2010 Florida Distressed Condominium Act, the Association has a right to compel tenants of a condominium unit owner to pay rent to the Association to the extent of delinquent assessments. Fla. Law, Ch. 2010-174. Although the Association has filed a claim in the amount of $314,188, the Debtor believes that the Association's claim against the Debtor is subject to substantial reduction for various expenses of the Association that were paid by the Debtor. The Association intends to apply these credits against the subordinated portion of its claims and assert the priority portion against the sale proceeds of each individual Condominium Unit sale. Debtor has consulted with the Association and it has consented to the Debtor's use of any putative cash collateral as proposed herein.

C.  **Other Secured Creditors**

20. In addition to NBV and the Association, Egozi may assert a secured claim as subrogee of Northern in the amount of approximately $3,000,000. The project's architect, RVL

---

[1] Effective July 1, 2010, the first mortgagee's liability for unpaid assessments increased the assessments which accrued or came due during the 12 months immediately preceding the acquisition of title. 718 116(1)(b)(1), Fla. Stat. (2010).

7

Architecture Design, P.A., asserts a mechanic's lien against the Property. Finally, Whirlpool Corporation asserts a purchase money security interest in certain appliances that it delivered and installed on the Property. The Debtor has obtained a judgment avoiding the Whirlpool security interest and preserving the same for the benefit of the estate. Therefore, the Debtor is entitled to adequate protection payments and a share of the rental income attributed to the appliances and other personal property.

## RELIEF REQUESTED AND GROUNDS FOR RELIEF

21.   The Debtor seeks authority to use two forms of cash collateral: (1) rental income received from the tenants of the Condominium Units; and (2) forfeited deposits relating to defaulted purchase agreements.

22.   While the Debtor continues to actively market the Condominium Units for sale, the Debtor concurrently intends to ready the Condominium Units for occupancy and offer them for lease. In order to effectuate an effective sales and leasing program, the Debtor contends that the Association must be fully funded, a number of incomplete Condominium Units must be finished and available for lease, and certain common area amenities must be completed.  The first two objectives have or are being completed under the authority of prior cash collateral orders. The Debtor has paid all Association assessments on all of the Condominium Units during the case. The Debtor has completed a number of capital projects, including the build out of model units, exterior deck waterproofing and other miscellaneous items that have materially improved the "street appeal" of the Property. The Debtor has recently received its permits to complete the dock renovation is proceeding forthwith with that project. The Debtor also made the "good faith" payment to the Dade County Taxing Authority with respect to the 2010 real estate taxes.

23. Eleven of the Debtor's 31 Condominium Units are leased to tenants pursuant to unexpired leases. The Debtor incurs and will continue to incur expenses in the operation of the rental program relating to the Condominium Units that are properly chargeable to the rental income of the Condominium Units. These expenses include the monthly Association assessments, a reserve for accruing real estate taxes, and maintenance and repairs attributable to the particular Condominium Unit. In addition, in order to sustain a leasing program for the Condominium Units, the Debtor will incur expenses in administering, advertising, and marketing the Condominium Units for rental. The expenses of operating the rental program are properly chargeable against the income generated by the program.

24. The Debtor further requests that the Court authorize it to use the existing defaulted purchase agreement deposits, and future defaulted purchase agreement deposits as they become available, to complete various capital improvements to the Property, to complete Condominium Units for sale or lease, and to pay the monthly Association assessments and monthly real estate tax escrow deposits on the Condominium Units. The Debtor requests authority to use existing and future rental income and defaulted purchase agreement deposits in accordance with the operating and capital improvements budget set forth on the attached **Exhibit "A"**.

25. Section 363(b)(1) provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 (a) and (c)(2) provides, however, that the "trustee may not, use, sell, or lease cash collateral under paragraph (1) of this subsection unless . . . each entity that has an interest in such cash collateral consents; or . . . the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provision of this section." The Debtor is entitled to

use cash collateral because, pursuant to the provisions of Sections 361 and 363 of the Bankruptcy Code, the interests of parties with an interest in such cash collateral will be adequately protected by the granting of a replacement lien upon future rental income, and personal property purchased and installed upon the Property and because the value of the primary collateral, the Property, will be enhanced by such expenditures. *Federal Nat. Mort. v. Dacon Bolingbrook Assocs.*, 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Constable Plaza Assoc.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor's reinvestment of rents to maintain and operate office building serves to preserve or enhance the value of the building subject to the mortgage); *In re Dynaco Corp.*, 162 B.R. 389, 395–96 (Bankr. D.N.H. 1983) (finding that the alternative to the debtor's use of cash collateral, termination of its business, would doom reorganization and any chance to maximize value for all creditors); *In re Karl A. Neise, Inc.*, 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on postpetition property acquired by debtor; debtors can use cash collateral in the normal operation of their business).

26.     The parties' interests are further adequately protected because the Debtor is proposing to use the cash collateral to pay maintenance and preservation expenses of the Property which secures the allowed claims of the entities with interests in the cash collateral; and, therefore, such expenses are otherwise recoverable from the Property pursuant to Section 506(c) of the Bankruptcy Code. *See, e.g.*, *In re North County Place, Ltd.*, 92 B.R. 437 (Bankr. C.D. Calif. 1988). Finally, the parties' interests are adequately protected because the completion of the capital improvements will enhance the overall value and marketability of the Condominium Units. *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984). In sum, these expenditures will preserve and enhance the value of the Property,

enhance the viability of the sales and marketing programs, and enable the Debtor to take advantage of the recovering real estate market to maximize recoveries for all creditors.

27. Moreover, NBV has not established that it has a perfected security interest in the purchase agreement deposits; therefore, it has not established that these deposits, substantial amounts of which have been used for the preservation and enhancement of its collateral, are its cash collateral. In addition, the tenant leases include payment for the use of the appliances and other personal property in the Condomium Units that are not NBV's collateral. Thus, a portion of the rental income derived from the Condominium Units should be allocated to the personal property or the same portion should be surcharged against the rental income and recovered by the estate.

28. The Debtor certifies that its counsel complied with Local Rule 9073-1(D) by contacting counsel for NBV in an attempt to resolve the matters addressed herein without a hearing, but that no consensual resolution could be achieved.

WHEREFORE, the Debtor respectfully requests entry of an order: (i) authorizing the use of rental income to pay the direct expenses of operating the Condominium Units, including the monthly Association assessments, a monthly real estate tax escrow, and ongoing maintenance and repairs relating to the Condominium Units; the capital cost of making Condominium Units ready for occupancy, and common area capital projects; (ii) authorizing the use of the defaulted purchase agreement deposits to pay direct expenses of the Condominium Units including the monthly Association assessments, a monthly real estate tax escrow, ongoing maintenance and repairs of the Condominium Units, the capital cost of making Condominium Units ready for occupancy, and common area capital projects; (iii) granting all parties asserting an interest in

cash collateral a replacement lien on postpeition rents and personal property purchased with cash collateral; and (iv) granting such further relief as may be just and proper.

Dated: February 18, 2010

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.

100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:   /s/ Michael L. Schuster
    Michael L. Schuster, Esq.
    Florida Bar No. 57119
    mschuster@gjb-law.com

-AND-

Paul M. Bauch, Esq.
Florida Bar No.363677
BAUCH & MICHAELS, LLC
53 W. Jackson Boulevard, Suite 1115
Chicago, Illinois 60604
Tel: (312) 588-5000
Fax: 312-427-5709

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on February 18, 2011 via CM/ECF upon all parties listed on the attached service list.

## SERVICE LIST

Joaquin J Alemany on behalf of Creditor 7935 NBV LLC
joaquin.alemany@hklaw.com, jose.casal@hklaw.com

Elizabeth Lee Beck on behalf of Counter-Defendant James Milana
elizabeth@beckandlee.com, jared@beckandlee.com;beckandlee@gmail.com;ekle2007@yahoo.com;cmecf@beckandlee.com

Lisa M. Castellano on behalf of Creditor Cielo on the Bay Condominium Associaiton
lcastellano@becker-poliakoff.com, tfritz@becker-poliakoff.com

Franck D Chantayan on behalf of Witness Northern Trust, N.A.
fchantayan@carltonfields.com, kdemar@carltonfields.com

Heather L Harmon on behalf of Debtor Harbour East Development, Ltd.
HHarmon@gjb-law.com, gjbecf@gjb-law.com

Luke J Hinkle on behalf of Debtor Harbour East Development, Ltd.
lhinkle@bauch-michaels.com

Daniel M Hirschman on behalf of Counter-Claimant Whirlpool Corporation
dhirschman@ghblaw.com, cstewart@ghblaw.com;aguerra@ghblaw.com;sperez@ghblaw.com

Bruce C King on behalf of Other Professional The Northern Trust Company
bking@carltonfields.com, jduran@carltonfields.com

Lawrence R Metsch on behalf of Creditor Reza Rahimzadegan
l.metsch@metsch.com

Miami-Dade County Tax Collector
mdtcbkc@miamidade.gov

Mindy A. Mora on behalf of Creditor 7935 NBV LLC
mmora@bilzin.com, laparicio@bilzin.com;abeck@bilzin.com;eservice@bilzin.com;lflores@bilzin.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

13

Paul L. Orshan on behalf of Interested Party Mario Egozi
plorshan@orshanpa.com, maria@orshanpa.com;jeffrey@orshanpa.com

Jeffrey I. Snyder on behalf of Defendant 7935 NBV LLC
jsnyder@bilzin.com, eservice@bilzin.com;abeck@bilzin.com;lflores@bilzin.com

C David Tangora on behalf of Creditor Mark Traverso
tangoralaw@bellsouth.net

Melinda S Thornton on behalf of Creditor Miami-Dade County Tax Collector
cao.bkc@miamidade.gov

Erica S Zaron on behalf of Creditor Miami-Dade County Tax Collector
cao.bkc@miamidade.gov

# **EXHIBIT "A"**

**Harbour East Development, Ltd.**
**Case #: 10-20733-BKC-AJC**
**6 Month Budget**
**USD ($Actual)**

| | Budget Mar-11 | Budget Apr-11 | Budget May-11 | Budget Jun-11 | Budget Jul-11 | Budget Aug-11 | 6 month budget Total |
|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** [1] | | | | | | | |
| Cash Collateral Account (defaulted escrow deposits) [2] | $ 154,600 | $ 41,869 | $ 1,080 | $ - | $ - | $ - | $ 154,600 |
| Operating Account | 40,000 | 31,452 | 46,138 | 35,629 | 22,493 | 37,346 | 40,000 |
| | $ 194,600 | $ 73,321 | $ 47,218 | $ 35,629 | $ 22,493 | $ 37,346 | $ 194,600 |
| **Receipts:** | | | | | | | |
| Rental Revenue [3] | 32,100 | 43,350 | 43,050 | 54,950 | 55,950 | 61,950 | 291,350 |
| **Total Receipts** | $ 32,100 | $ 43,350 | $ 43,050 | $ 54,950 | $ 55,950 | $ 61,950 | $ 291,350 |
| **Disbursements:** | | | | | | | |
| Operating Expenses | | | | | | | |
| Bank Fees | 25 | 25 | 25 | 25 | 25 | 25 | 150 |
| Condo Association Assessments | 19,104 | 19,104 | 19,104 | 19,104 | 19,104 | 19,104 | 114,623 |
| Cleaning/Unit preparation Expense | 200 | 200 | 200 | 200 | 200 | 200 | 1,200 |
| FHA Qualification Fees | - | - | - | - | - | - | - |
| Filing Fees | 640 | - | - | - | - | - | 640 |
| Insurance (Developer) | 5,648 | - | - | - | - | - | 5,648 |
| Marketing and Promotion | 2,300 | - | - | | | | 2,300 |
| Office Expenses/Postage | 100 | 100 | 100 | 100 | 100 | 100 | 600 |
| Property Taxes | - | - | - | - | - | - | - |
| Repairs & Maintenance [4] | 1,500 | 500 | 1,000 | 500 | 500 | 500 | 4,500 |
| Rental Commission (at 8%) | 9,096 | 5,520 | 8,160 | 8,928 | 6,720 | 4,992 | 43,416 |
| Telephone | 150 | 150 | 150 | 150 | 150 | 150 | 900 |
| Utilities | 1,710 | 1,440 | 1,350 | 1,080 | 990 | 900 | 7,470 |
| Website and domain | 175 | - | 200 | - | 200 | - | 575 |
| **Total Operating Expenses** | $ 40,648 | $ 27,039 | $ 30,289 | $ 30,087 | $ 27,989 | $ 25,971 | $ 182,022 |
| Non-Operating Expenses | | | | | | | |
| Capital Improvements [5] | | | | | | | |
| Dock [6] | 62,500 | - | - | - | - | - | 62,500 |
| Furnishings for Leased Units | 5,000 | - | - | - | - | - | 5,000 |
| Buildout of Ready/Model Units | 38,231 | 26,789 | 17,350 | 24,000 | - | - | 106,370 |
| Appliances for Ready Units | 7,000 | 14,000 | 7,000 | 14,000 | - | - | 42,000 |
| Total Capital Improvements | 112,731 | 40,789 | 24,350 | 38,000 | - | - | 215,870 |
| Tax Accounting [7] | - | - | - | - | 11,483 | - | 11,483 |
| US Trustee Quarterly Fees | - | 1,625 | - | - | 1,625 | - | 3,250 |
| Payment to Lender NBV | - | - | - | | | | - |
| Payments to Whirlpool | - | - | - | | | | - |
| **Total Non-Operating Expenses** | $ 112,731 | $ 42,414 | $ 24,350 | $ 38,000 | $ 13,108 | $ - | $ 230,603 |
| **Total Disbursements** | $ 153,379 | $ 69,453 | $ 54,639 | $ 68,087 | $ 41,097 | $ 25,971 | $ 412,625 |
| Net Change in Cash | $ (121,279) | $ (26,103) | $ (11,589) | $ (13,137) | $ 14,853 | $ 35,979 | $ (121,275) |
| Ending Cash Balance | $ 73,321 | $ 47,218 | $ 35,629 | $ 22,493 | $ 37,346 | $ 73,325 | $ 73,325 |

**Notes:**

[1] Amount represents funds available for use in operations and for capital improvements. It is net of amounts held in escrow for tenant security deposits.

[2] Includes $76,600 estimated to be received in February 2011 from the defaulted deposit of unit 1404

[3] Estimated cash collections.

[4] Includes the cost of paint and other repairs required to make units rent ready after tenant turnover.

[5] Expenditures for capital improvements are to be paid from the Cash Collateral Account (defaulted escrow deposits), to the extent such funds are available.

[6] Based on prior period estimate of $70,000 less expenditures to date of approximately $7,500.

[7] Amount budgeted for March is the past due amount due to the accountant for preparation of 2009 return. The amount set forth for August represents the fees for preparation of the 2010 return and assumes an extension will be filed.

**Cielo on the Bay Condominium Association**
**6 Month Operating Budget**
**USD (Actual) - Cash Basis**

|  | *Budget March 2011* | *Budget April 2011* | *Budget May 2011* | *Budget June 2011* | *Budget July 2011* | *Budget August 2011* | 6 month Total |
|---|---:|---:|---:|---:|---:|---:|---:|
| **Beginning Cash Balance** | $ 70,000.00 | 64,227 | 60,954 | 57,681 | 59,408 | 61,135 | $ 70,000.00 |
| **Receipts** | | | | | | | |
| Condo Assessments [1] | $ 21,537 | $ 21,537 | $ 21,537 | $ 21,537 | $ 21,537 | $ 21,537 | $ 129,222 |
| **Total Receipts** | $ 21,537 | $ 21,537 | $ 21,537 | $ 21,537 | $ 21,537 | $ 21,537 | $ 129,222 |
| **Disbursements** | | | | | | | |
| Accounting (Tax and Audit) | $ - | $ 5,000 | $ 5,000 | $ - | $ - | $ - | 10,000 |
| Alarm Monitoring | 55 | 55 | 55 | 55 | 55 | 55 | 330 |
| Bank Fees | 25 | 25 | 25 | 25 | 25 | 25 | 150 |
| Cable/Internet | 450 | 450 | 450 | 450 | 450 | 450 | 2,700 |
| Elevator Maintenance Contract | 540 | 540 | 540 | 540 | 540 | 540 | 3,240 |
| Generator Maintenance Contract | 70 | 70 | 70 | 70 | 70 | 70 | 420 |
| Insurance [2] | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 45,000 |
| Landscaping | 100 | 100 | 100 | 100 | 100 | 100 | 600 |
| Legal Fees [3] | 8,500 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 13,500 |
| Maintenance Personnel | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 3,200 | 19,200 |
| Management Company | 450 | 450 | 450 | 450 | 450 | 450 | 2,700 |
| Office Expenses | 100 | 100 | 100 | 100 | 100 | 100 | 600 |
| Pest Control | 200 | 200 | 200 | 200 | 200 | 200 | 1,200 |
| Pool Service | 195 | 195 | 195 | 195 | 195 | 195 | 1,170 |
| Postage and Delivery | 25 | 25 | 25 | 25 | 25 | 25 | 150 |
| Repairs & Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| Supplies (cleaning and maintenance) | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| Telephone | 400 | 400 | 400 | 400 | 400 | 400 | 2,400 |
| Utilities - Electric | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| Utilities - Water & Sewer | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 12,000 |
| **Total Disbursements** | $ 27,310 | $ 24,810 | $ 24,810 | $ 19,810 | $ 19,810 | $ 19,810 | $ 136,360 |
| **Ending Cash Balance** | $ 64,227 | $ 60,954 | $ 57,681 | $ 59,408 | $ 61,135 | $ 62,862 | $ 62,862 |

**Notes**

(1) Assessments due from unit owners and developer (for developer owned units) based on proposed 2011 budget.

(2) The current monthly insurance premium, as financed, is $8,583.99, however, the Association is due a refund which resulted from an adjustment in the total cost of the policy. The refund will be applied to the balance of the funds due and accordingly, will reduce the monthly payments. The amount reflected here is the estimated adjusted monthly amount.

(3) March amount represents current accrued balance due to attorney.