

**ORDERED in the Southern District of Florida on December 5, 2011.**

A. Jay Cristol, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

HARBOUR EAST DEVELOPMENT, LTD.,                    Case No. 10-20733-BKC-AJC

                                                   Chapter 11

       Debtor.
_____ /

### MEMORANDUM OPINION DENYING IN PART DEBTOR'S THIRD MOTION FOR ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(C)(2) AND (II) AUTHORIZING THE RECOVERY OF MAINTENANCE AND PRESERVATION EXPENSES FROM PROPERTY SECURING ALLOWED CLAIMS PURSUANT TO 11 U.S.C. § 506(C) AND DENYING AS MOOT DEBTOR'S SUPPLEMENTAL MOTION FOR ORDER AUTHORING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(C)(2) TO OBTAIN SUPERSEDEAS BOND

THIS CAUSE came before the Court for hearing on August 19, 2011 at 10:30 a.m. upon

the Debtor's *Third Motion for Order (I) Authorizing the Use of Cash Collateral Pursuant to 11*

*U.S.C. § 363(c)(2) and (II) Authorizing the Recovery of Maintenance and Preservation Expenses* *from Property Securing Allowed Claims Pursuant to 11 U.S.C. § 506(c)* [ECF No. 421] and the *Debtor's Supplemental Motion for Order Authorizing the Use of Cash Collateral Pursuant to 11* *U.S.C. § 363(C)(2) to Obtain Supersedeas Bond* [ECF No. 434] (collectively, the "Motion") and the Objection [ECF No. 447] (the "Objection") to the Motion filed by first priority mortgage holder 7935 NBV, LLC ("NBV").

## GENERAL BACKGROUND

Harbour East Development, Ltd. ("Harbour East") or the "Debtor") is a real estate developer that developed and built a 35-unit luxury residential condominium development known as Cielo on the Bay ("Cielo") located at 7935 East Drive, North Bay Village. The Debtor currently owns 31 of the 35 residential condominium units in Cielo (the "Condominium Units" or the "Property").

On or about December 28, 2005, the Debtor executed a construction loan agreement with Northern Trust Bank ("Northern Trust"), whereby Northern Trust made a construction loan (the "Loan") to the Debtor in the aggregate principal amount of $16.9 million (the "Loan Agreement").   The Loan was evidenced by a promissory note (the "Note") executed by the Debtor in favor of Northern Trust in the principal amount of $16.9 million, which in turn was secured by a first priority mortgage granted by the Debtor to Northern Trust that encumbered Cielo (the "Mortgage").

On April 27, 2009, the Loan matured and the Debtor was required to pay all unpaid principal, interest, and other sums due under the Note and Loan Agreement.   On October 13, 2009, Northern Trust declared the Debtor in default and demanded full payment of all sums due,

along with the turnover of all rents, if any, generated by the Property.  Debtor did not comply with the demand for payment and turnover.

On December 21, 2009, Northern Trust sold its interest in the Loan Agreement, the Mortgage, the Note and related documents (collectively, the "Loan Documents") to NBV as the designee of TMS FL 2, Inc.

After purchasing the Loan Documents, on January 13, 2010, NBV filed its Complaint in the Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida, Case No. 10-02180-CA-25 (the "Foreclosure Action"), to enforce and foreclose the Mortgage, and to collect on the Note.

Pursuant to an order of the Circuit Court, a two-hour evidentiary hearing was scheduled to take place in the Foreclosure Action on April 23, 2010 to consider the Receiver Motion (the "Receiver Hearing").  However, on April 22, 2010 (the "Petition Date"), the day before the Receiver Hearing, the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code.

It is undisputed that NBV is undersecured, given the appraised value of the Property.  As of the Petition Date, NBV claims to be owed $15,598,530.54 in unpaid principal, plus accrued interest, protective advances, attorney's fees and costs.  *See* NBV Proof of Claim No. 6-1. Shortly before the Petition Date, NBV had the Property appraised by Michael Cannon of Integra Realty Resources, who determined that the fair market value of the Property was $8,000,000 using a discounted sell-out cash flow model.  The Debtor relies on this value in its Second Amended Plan of Reorganization [ECF No. 319] and accompanying First Amended Disclosure Statement [ECF No. 320].

The Debtor is controlled by Mario Egozi ("Egozi"), an architect. Egozi is the sole member of the limited liability company that is the general partner of the Debtor. There are sixteen limited partners in the Debtor. [List of Equity Security Holders, ECF No. 3.]

Since the Petition Date, the Debtor through Egozi, has been in control of the Property and other assets as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

Cielo's common elements are being operated by the CIELO by the Bay Condominium Association (the "Association"). The Association's primary source of funds is from condominium assessments, mostly derived from rent revenue generated by leasing the Condominium Units.

## PROCEDURAL HISTORY AND QUESTION PRESENTED

The Court held a non-evidentiary hearing on the Motion on August 19, 2011 at 10:30 a.m. (the "Hearing"). At the hearing, the Debtor and NBV agreed to entry of the *Eighth Interim Order (I) Authorizing, in Part, the Use of Cash Collateral Pursuant to 11 U.S.C. § 363(C)(2)* [ECF No. 461] (the "Eighth Interim Order"), which order, *inter alia*, authorizes the Debtor to use cash collateral consisting of rental income for the limited purposes set forth on the budget annexed thereto. The parties characterized the Eighth Interim Order as a "bridge order allowing [the Debtor] another 60 days to use cash collateral with a build-out of only one unit." Tr. of Hr'g, 26:15-19 (Aug. 19, 2011) [ECF No. 458].

Notwithstanding the limited agreement set forth in the Eighth Interim Order, the Debtor and NBV continue to disagree as to whether the Debtor may continue to utilize cash collateral to fund $119,000[1] for the build out of additional units and other similar expenses. NBV contends that it is not adequately protected for the use of its cash collateral for this purpose because the

Budget attached to the Motion (the "Budget") (a) reflects negative cash flow from operations for September through December 2011,[2] (b) projects that the Debtor's cash balance will diminish from $83,297 at the end of September 2011 to under $20,000 at year end, (c) fails to adequately escrow for the payment of 2011 ad valorem real property taxes, (d) fails to provide for the payment of debt service or required interest payments pursuant to 11 U.S.C. § 362(d)(3), and (e) requires NBV to assume the risks associated with the Debtor's rental-based business plan.

The Debtor argues that it is "entitled" to use cash collateral pursuant to 11 U.S.C. §§ 361 and 363 because NBV will receive a replacement lien on future rental income and on personal property purchased with cash collateral and "because the value of the primary collateral, the Property, will be enhanced by such expenditures."  Motion at ¶ 31.  The Debtor also suggests that it could surcharge NBV's collateral pursuant to section 506(c) for actual, necessary costs and expenses of preserving the Property and that capital improvements will "enhance the overall value and marketability of the Condominium Units."  *Id.* at ¶ 32.  Finally, the Debtor argues that it need not make payments pursuant to 11 U.S.C. § 362(d)(3) of the Bankruptcy Code because it is not a "single asset real estate" debtor as defined in 11 U.S.C. 101(51B) and, alternatively, that a payment to NBV on October 5, 2010 from the proceeds of the sale of a condominium unit constitutes 29 payments under 11 U.S.C. §362(d)(3).  Motion at ¶ 34.

---

[1] The Budget provides for a total of $134,000 in non-operating expenses for capital improvements.  Because NBV has consented to $15,000 of such expenditures in the Eighth Interim Order, only $119,000 in such expenses are contested.

[2] This operating result excludes non-recurring income from Defaulted Escrow Deposits and Accrued Interest in September 2011 which has been found by this Court to constitute NBV's cash collateral.  *See* Adv. Proc. 10-3584-AJC, ECF No. 51.

## DISCUSSION AND ANALYSIS

Section 363(c)(2) and (e) prohibit the Debtor from using cash collateral unless all parties having an interest in the cash collateral consent or such use is authorized by the Court after a determination that interested parties are adequately protected.

Until this point, the Debtor and NBV have reached agreement on the use of cash collateral and, accordingly, the Debtor's use has been consensual and thereby authorized pursuant to 11 U.S.C. § 363(c)(2).  By consensual interim use of cash collateral, the Debtor has operated for about 20 months now.

By the Objection, however, NBV has refused to consent to further use of cash collateral for the Debtor to build out additional units for rentals.  Further, NBV objects generally to the Debtor's continued use of cash collateral pursuant to a budget that does not provide for any debt service through at least the end of 2012.  NBV, having observed that the Budget reflects a diminishing cash position in the fourth quarter of 2011, claims that it is not adequately protected for such use.  NBV also alleges that, although the Budget includes monthly payments to a real property tax escrow, the Budget fails to make up a $125,000 tax shortfall prior to the 2011 real property taxes coming due, therefore allowing NBV's lien to be primed by a lien in favor of the tax collector.  When adequate protection is disputed and the use of cash is non-consensual, the burden of proof is on the Debtor to prove that a secured creditor is adequately protected.  11 U.S.C. §§ 363(p)(1) and 1107(a).

### A.    Proposed Use of Cash Collateral for Capital Improvements

The Debtor seeks to fund $119,000 in non-operating expenses for capital improvements during the remainder of 2011 in addition to the $15,000 that NBV authorized pursuant to the Eighth Interim Order.  The Debtor wishes to use these funds to build-out unsold condominium

units to prepare them for rental and to purchase furniture and appliances for these units. The Debtor's Budget utilizes a one-time $115,000 influx of forfeited purchaser deposits[3] for its proposed capital expenditures.

The Budget includes a projection for 2012 operating results that reflects $983,880 in rental revenues and positive cash flow of $258,182 (without payment of any debt service or payment pursuant to 11 U.S.C. § 362(d)(3)). The Motion suggests that this projected future rental stream, along with a replacement lien on furniture and appliances installed in the units (depreciating assets that are of little value once used) form the basis for concluding that NBV is adequately protected for the use of its cash collateral.

The viability of the projections in the Budget has not been proven, but even if the Budget were proven to be reasonable, the Court cannot allow the Debtor to fund capital improvements from cash collateral without NBV's consent or a replacement lien on previously unencumbered assets that affords NBV dollar-for-dollar protection for the diminishment in its cash collateral projected during the last quarter of 2011. *See Desert Fire Protection v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC)*, 434 B.R. 716, 727 (S.D. Fla. 2010) (use of cash collateral requires dollar-for-dollar adequate protection in the form of new collateral). The Debtor has not demonstrated the Property will be enhanced, dollar-for-dollar, by the expenditures proposed by the Debtor. The possibility that the Debtor's rental program may perform as projected does not justify shifting the risk of success or failure from the Debtor to NBV. *Resolution Trust Corp. v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.)*, 16 F.3d 552 , 557 (3d Cir. 1994) (en banc*)* ("Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for

---

[3] The Court has previously determined that these forfeited deposits are NBV's cash collateral. [Adv. Proc. 10-3584-AJC, ECF No. 51].

the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects.")  Clearly, if the Debtor does not perform as projected in the Budget, the adverse effects will be visited upon NBV.

**B.    Surcharge**

The Court agrees with the Debtor that the use of cash collateral for basic expenses such as utilities, telephone, and repairs and maintenance is necessary to preserve the value of the Property and that such expenses may be recoverable by surcharge if they were funded from unencumbered cash.  However, the Debtor's effort to rely upon surcharge pursuant to 11 U.S.C. § 506(c) is premature.  With respect to expenses to date, surcharge is inapplicable because all expenses which have been paid thus far have been paid from NBV's cash collateral, not by unencumbered assets in the Debtor's estate.  Where surcharge is applicable, it may be utilized to *recover* an expense from property, not to obtain advance approval to speculate with a secured creditor's collateral.  11 U.S.C. § 506(c).  To surcharge NBV's collateral, the Debtor must demonstrate that NBV expressly or impliedly consented to the expense or, absent such consent, that (a) the expenditure was necessary; (b) the amount expended was reasonable; and (c) NBV benefited from the expenditure.  *In re Spa at Sunset Isles Condominium Assoc., Inc.*, --- B.R. ----, 2011 WL 3290239 (Bankr. S.D. Fla. July 13, 2011).  In other words, surcharge may be employed to obtain reimbursement of expenses paid from unencumbered assets, if NBV demonstrably benefited by such expenses.  *In re Cascade Hydraulics and Utility Service, Inc*., 815 F.2d 546, 548 (9th Cir. 1987) (party seeking the surcharge must prove that its expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor).  The Debtor must, at a minimum, demonstrate through competent evidence that the expenses at issue actually increased the value that NBV realizes from its collateral.  However, based upon the record before it, this

8

Court cannot make the required analysis and therefore denies the use of cash collateral except to the extent authorized by the Eighth Interim Order or as otherwise consented to by NBV, without prejudice to the presentation of evidence on the issues of value and benefit.

###### C.    Single Asset Real Estate Determination

NBV contends that the Debtor's proposed Budget is also deficient because it fails to provide for any debt service to NBV or for required payments pursuant to 11 U.S.C. § 362(d)(3). The Debtor contends that 11 U.S.C. § 362(d)(3) payments are not required because this chapter 11 case is not a "single asset real estate" case and, alternatively, that a payment to NBV on October 5, 2010 from the proceeds of the sale of a condominium unity should be counted as 29 monthly § 362(d)(3) payments.  Motion at ¶ 34.

Section 101(51B) of the Bankruptcy Code provides:

> The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

Accordingly, there are three elements that must be met for a debtor to be considered a single asset real estate debtor: "(1) the debtor must have real property constituting a single property or project (other than residential real property with fewer than 4 residential units), (2) which generates substantially all of the gross income of the debtor, and (3) on which no substantial business is conducted other than the business of operating the real property and activities incidental thereto." *In re Scotia Pacific Co., LLC,* 508 F.3d 214, 220 (5th Cir. 2007).

This case appears to be the prototypical single asset real estate case.  It is a single condominium project and generates all of the Debtor's income (notionally through sales, but

since the Petition Date through rentals).  Thus, the remaining question is whether a Debtor that is involved in the active development of real property by constructing improvements and selling subdivided portions of the real property is a single asset real estate debtor?  The only reported decision to directly address this question concluded that such a debtor is a single asset real estate debtor. *In re Kara Homes, Inc.*, 363 B.R. 399 (Bankr. D.N.J. 2007).  In *Kara Homes*, the court concluded that the business of subdividing real property, constructing improvements and selling subdivided portions of the real property was "the business of operating the real property and activities incidental."  It therefore concluded that the Debtor was a single asset real estate debtor. *Id.*

The only meaningful difference between the Property and the developments in *Kara Homes* is that the Property is a condominium project as opposed to a single family home project.  This means that the Association operates and maintains the common areas and the Debtor's business is to sell (and recently rent) units.  This Court concludes that this is a distinction without a difference, and that leasing and selling condominium units is not a "substantial business being conducted by a debtor other than the business of operating the real property and activities incidental."  The Court therefore finds and concludes that the Debtor meets the definition of a single asset real estate debtor under 11 U.S.C. § 101(51B).

> **D.        § 362(d)(3) Payments**

Given that the Debtor is a single asset real estate debtor, the Debtor is required to make monthly payments in respect of the secured portion of NBV's claim at the prepetition non-default contract interest rate, ***unless the Debtor has proposed a plan that has a reasonable possibility of being confirmed in a reasonable time***.

The Debtor previously filed its Second Amended Plan of Reorganization on December 15, 2010 [ECF No. 319]. This plan included an effort to have NBV provide seller financing on residential mortgages. The Debtor made no effort to prosecute the Second Amended Plan and later filed a new Disclosure Statement and its Third Amended Plan of Reorganization [ECF No. 449]. This latest plan relies upon rental of the entire building and does not provide for any payments to NBV during 2012; and, it apparently also seeks to sell condominium units and remit only a percentage of the proceeds to NBV while extending the maturity of the Loan.

Although the Court is not ruling on any confirmation issue at this time, there are serious questions about the confirmability of the Third Amended Plan. It is not a run-of-the-mill plan, but rather seeks to aggressively extend the maturity of the Loan for 10 years, and apparently relies upon the favorable outcome of matters that are *sub judice*. Although this Court wishes to provide the Debtor with the opportunity to reorganize if possible, a single asset real estate debtor proposing such an aggressive plan cannot avoid making the required payment under § 362(d)(3).

Because the confirmation hearing on the Debtor's plan is quickly approaching, the Court will soon know with certainty whether the plan is confirmable. If confirmed, the plan will ostensibly control the parties' relationship. However, if the plan is not confirmed at the upcoming confirmation hearing, the Debtor must begin making payments to NBV pursuant to the statute. The Court will initially base the required payment upon the $8 million appraisal prepared by Integra Realty Group (without determining the value of the Property for any other purpose). Accordingly, utilizing the prepetition non-default interest rate of LIBOR plus 2.5 percent per annum, the Debtor's required annual payment to NBV pursuant to 11 U.S.C. § 362(d)(3) is $220,000 or $18,333.33 per month, as argued by NBV at the Hearing. Hr'g Tr., 12:1-7 (Aug. 19, 2011) [ECF No. 458].

In the Motion, the Debtor argues that a payment that it made to NBV on October 15, 2010 consisting of proceeds from the sale of a condominium unit may now be counted as 29 months of § 362(d)(3)(B)(i) payments.  Motion at ¶ 34.  The Debtor relies upon *In re Kara Homes, Inc.* for the proposition that the Debtor may use "other income generated" . . . "by or from the property" to make 362(d)(3) payments.  363 B.R. 399 (Bankr. D.N.J. 2007), Motion at ¶ 34.  Although the Debtor is correct that it may use income ***generated by*** the property such as rental income to fund § 362(d)(3) payments, that is quite different from using the ***proceeds of*** the property to make such payments, as the sale of the property necessarily reduces the amount of remaining collateral by the amount of the sale price.  *Kara Homes* does not authorize a Debtor to sell collateral, pay the lender for the loss of its collateral from the sale proceeds, and double-count the same payments as payment of interest for 29 months.  *Kara Homes* does not support the proposition that sale proceeds of collateral are "other income" for purposes of § 362(d)(3).  The proceeds realized from the sale of lender's collateral do not constitute "other income" which can be used by the Debtor to make § 362(d)(3) payments to that same lender.

Based upon the foregoing, it is

ORDERED AND ADJUDGED as follows:

1.    The Debtor's *Third Motion for Order (I) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) and (II) Authorizing the Recovery of Maintenance and Preservation Expenses from Property Securing Allowed Claims Pursuant to 11 U.S.C. § 506(c)* [ECF No. 421] is DENIED to the extent that it seeks to use cash collateral except as authorized under the Eighth Interim Order.

2.    The *Debtor's Supplemental Motion for Order Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363(C)(2) to Obtain Supersedeas Bond* [ECF No. 434] is DENIED as moot.

3.    If the Debtor fails to confirm a plan at the upcoming confirmation hearing, the Debtor shall commence making monthly payments to NBV pursuant to § 362(d)(3) in the amount of $18,333.33 within 30 days of the confirmation hearing.

# # #

Submitted by:
Mindy A Mora, Esq.
Jeffrey I. Snyder, Esq.
Bilzin Sumberg Baena Price & Axelrod, LLP
1450 Brickell Avenue, Suite 2300
Miami, FL 33131

Copy furnished to:
Mindy A. Mora, Esq., who shall serve a copy of this order on all interested parties and file a certificate of service.